IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CR 23-82-BLG-SPW |
| Plaintiff, | |
| vs. | ORDER |
| DOUGLAS EUGENE NORWICK, JR., | |
| Defendant. | |

Before the Court is Defendant Douglas Eugene Norwick, Jr.'s Motion to Suppress. (Doc. 25). Norwick asks the Court to suppress all the statements he made during his interaction with the Montana Department of Correction's Probation and Parole Division ("Probation Office") and the Bureau of Alcohol, Firearms, and Tobacco ("ATF") at the Probation Office and Norwick's residence on April 12, 2023. (*Id.*; Doc. 26 at 2). Norwick argues that his answers were involuntarily elicited in violation of the Fifth Amendment, or, in the alternative, were the result of an un-Mirandized custodial interrogation also in violation of the Fifth Amendment. (Doc. 26 at 2). Norwick requested a hearing. (Doc. 25).

The Government responded that it only plans to use in its case-in-chief one of the four substantive statements Norwick made.[1] (Doc. 33 at 2–3). The Government

---

[1] The United States reserves the right to use the three other statements for impeachment evidence if Norwick testifies at trial. (Doc. 33 at 3 n.3).

argues that statement was voluntary and not made in the context of an interrogation. (*Id.* at 3).  Thus, suppression is not warranted.  (*Id.* at 4).

Norwick did not file a reply.

The Court held an evidentiary hearing on April 18, 2024.   (Doc. 35). Probation Officer Lillian Ahern testified.  The Court finds the material facts are not disputed based on the parties' briefing, the officers' reports, and Ahern's testimony.

For the following reasons, the Court denies Defendant's motion.

## I.    Factual Background

Norwick was placed on community supervision with the Probation Office on July 12, 2022.  (Doc. 27 at 8).[2]  As part of his conditions of supervision, Norwick was not allowed to possess or consume alcohol, or to use, own, possess, transfer, or be in control of any firearms, ammunition, or weapons.  (*Id.* at 4).  Norwick also agreed to "make [his] home open and available for Officers to visit or search upon reasonable suspicion."  (*Id.* at 11).  He is required "at all times [to] be cooperative and truthful in all [his] communications and dealing with Probation/Parole Officers and any law enforcement agency."  (*Id.*).

---

[2] The parties do not state the reason Norwick is on supervision.  However, it appears he is on conditional release with the Department on Corrections on his 60-month sentence in Yellowstone County for Criminal Possession of Dangerous Drugs, DC 19-1224, and for a violation of the conditions of his probationary sentence in DC 14-0676 for Persistent Felony Offender for Partner Family Member Assault.    Montana Department of Corrections Offender Search, https://app.mt.gov/conweb/ (last accessed April 23, 2024); *see also* (Doc. 27 at 13) (ATF report describing Norwick as on supervision for Criminal Possession of Dangerous Drugs).

On April 11, 2023, the Probation Office received a report from the Laurel Police Department stating that Norwick was reportedly drinking and driving and had threatened to shoot or drown his daughter. (*See* Doc. 34-1 at 4; Doc. 27 at 2). He reportedly told his daughter he would shoot her with a gun he kept in the garage. (Doc. 27 at 2). Norwick disputes these accusations. (Doc. 26 at 3 n.1).

The same day, Ahern and four other probation officers went to Norwick's house east of Billings to do a welfare check. According to Ahern, the officers were concerned he was a danger to himself, as Norwick reportedly indicated he wanted to kill himself. Ahern could not recall at the hearing why officers believed this; however, the chronological notes state that the complaint filed with the Laurel Police Department details that concern. (*Id.*).

When the officers arrived at Norwick's residence, his vehicle was in the driveway. (Doc. 34-1 at 4). The officers noticed cans of Twisted Tea—an alcoholic iced tea—in the bed of his truck and two cases in the back seat containing two full bottles. (*Id.*). The officers knocked on the door to the residence and announced their presence, but no one answered. (*Id.*). Probation Officer Howlett left his business card in the door. (*Id.*).

The next day, Ahern called Norwick and sent him a text asking him to come to the Probation Office as soon as possible, to which Norwick responded he was on his way. (*Id.*). Ahern testified that the officers met with Norwick and asked him if

he would test positive for alcohol. He said he had one drink on April 9, 2023. (*Id.*).

The officers conducted a urinalysis examination, and Norwick tested positive for alcohol. (*Id.* at 3).   The officers handcuffed Norwick and took him to Sergeant Stichman, Ahern's supervisor.   (*Id.*).   Stichman spoke with Norwick about the positive test while Ahern and Officer Gibbons searched Norwick's truck.   (*Id.*). Ahern and Gibbons found 20 empty alcohol containers in the truck bed and an axe handle in the cab by the driver's side door. (*Id.*). The containers observed in the cab the day before were not there, and, when asked about them, Norwick said he had removed them. (*Id.*). Norwick also said the axe handle was for catfishing, though no other fishing supplies were in his vehicle. (*Id.*).

The officers decided to do a home search. (Doc. 27 at 2).   According to Ahern's testimony, the officers took Norwick, who was still in handcuffs, with them because it was unclear if anyone would be home.  She testified Norwick's mother's vehicle was at the residence, so officers knocked on the door and announced their presence. (*See* Doc. 34-1 at 3). After a couple minutes without a response, officers used Norwick's keys to go inside. (*Id.*). Howlett, Gibbons, and Officer Steiner went to the basement to clear the residence, and they found Norwick's mother in the bathroom. (Doc. 27 at 2). The officers then searched upstairs. (*Id.*). They found no violations of Norwick's conditions. (*Id.*).

4

While the other officers searched the home, Ahern stayed upstairs with Norwick. (*Id.*). She asked him if he had access to the garage, to which he said, according to the report, "that everyone in the house had because it was unlocked. He said his mother, his son, and his kids could access the garage." (*Id.*). Ahern also reported that Norwick stated he spends time in the garage cleaning it up. (*Id.*).

The officers went into the garage, which Ahern testified was attached via a breezeway to the house and was big enough to hold two or two-and-a-half cars. Among other items, officers noticed a cabinet with a BB gun and some fireworks, which Norwick is not allowed to have. (*Id.* at 2–3). Howlett told Norwick he needed to have someone remove them. (Doc. 34-1 at 3). Norwick said he did not spend much time in the garage and did not really know what was in it. (*Id.*).

The officers then observed antlers hanging from the rafters, and Steiner said they looked fresh because of their color and the tufts of fur on them. (*Id.*). Steiner also noticed what appeared to be a firearm case in the rafters. (*Id.*; Doc. 27 at 3). Howlett retrieved the cases and handed them to Ahern. (Doc. 27 at 3). Ahern opened one and saw a firearm. (*Id.*). Norwick stated the gun belonged to his father. (*Id.*).

Ahern testified that she then walked outside of the garage to call Stichman about the firearms. Stichman did not pick up, so Ahern contacted another Probation Officer supervisor, then the ATF, about the firearms. (*Id.*).

Ahern walked back inside the garage. Stichman called her back, and Ahern told her over the phone that they had found three shotguns in the garage. Norwick stated they were not all shotguns, but rather a pump action .22, a .338, and a shotgun. (*Id.* at 3). He then said they were his son's guns. (Doc. 34-1 at 3). Ahern testified that, at this point, she was in the lefthand back corner of the garage, and Norwick was in the righthand front corner.

The officers continued searching the garage and found three rounds of ammunition. (*Id.*). The ATF arrived a couple minutes later and documented the firearms. (*Id.*). The ATF agent asked if Norwick wanted to make a statement, to which Norwick said no. (*Id.*). The Officers then transported Norwick to the Yellowstone County Detention Center. (*Id.*).

On July 13, 2023, Norwick was charged in this Court, with Prohibited Person in Possession of a Firearm in violation of 18 U.S.C. § 922(g)(1) and a Forfeiture Allegation under 18 U.S.C. § 924(d). (Doc. 1). He filed his suppression motion on February 13, 2024. (Doc. 25).

## II.    Discussion

Norwick challenges the admission of all the statements he made to law enforcement on April 12, 2023. (*Id.*). The Government listed the four "substantive statements" Norwick made as:

> (1) State Probation Officer Lillian Ahern asked Norwick if he had access to the garage, and Norwick started that everyone had access because it was kept

unlocked, and he said his mother, his son, and his kids, could all access the garage;

(2) Norwick stated, presumably in response to a question, that he did not know what was in the garage;

(3) Norwick made two conflicting statements when the three firearms were found - that he believed the guns belonged to his father and the other statement that he believed the guns belonged to his son; and

(4) Officer Ahern was on the phone with another probation officer and stated that three shotguns were found. Norwick, who was on the other side of the garage and not in response to any question posed to him, stated they were not all shotguns, one was [a] pump action .22, a .338, and a shotgun.

(Doc. 33 at 2).

Of these four statements, the Government only intends to use the fourth in its case-in-chief, though it reserves the right to use the other three as impeachment evidence if Norwick testifies. (*Id.* at 2–3 & n.3). Norwick did not indicate the Government's list of the challenged statements was incorrect or incomplete. The Court will only analyze whether the fourth statement should be suppressed as obtained in violation of the Fifth Amendment and reserves ruling on the admissibility of the others for impeachment if and when the issue arises.

The Fifth Amendment "protects a person ... against being incriminated by his own compelled testimonial communications." *Fisher v. United States*, 425 U.S. 391, 409 (1976); *see also* U.S. Const. amend. V. ("No person ... shall be compelled in any criminal case to be a witness against himself."). This prohibition not only allows a person "to refuse to testify against himself at a criminal trial in which he is a

7

defendant, but also 'privileges him not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings.'" *Minnesota v. Murphy*, 465 U.S. 420, 426 (1984) (quoting *Lefkowitz v. Turley*, 414 U.S. 70, 77 (1973)). The Fifth Amendment privilege against self-incrimination applies to the states through the Fourteenth Amendment. *See Malloy v. Hogan*, 378 U.S. 1, 8 (1964).

A.   *Suppression of the Statements as Involuntary*

"As a general rule, the Fifth Amendment speaks of compulsion[.]" *United States v. Saechao*, 418 F.3d 1073, 1077 (9th Cir. 2005) (internal citation and quotation marks omitted). An individual must invoke the privilege of their right to remain silent and not incriminate themselves; otherwise they will not be considered to have been compelled within the meaning of the Fifth Amendment. *Id*. This rule does not apply if "an individual is subjected to a practice that denies him … a free choice to admit, to deny, or to refuse to answer[.]" *Id*. (internal citation and quotation marks omitted). In that case, any statement the individual makes is considered involuntary and cannot be used in a criminal proceeding. *Id*. The Fifth Amendment is considered self-executing in such a case, meaning an individual does not need to invoke the right to have their admissions suppressed in a subsequent criminal prosecution. *Id*.

One instance in which an individual is considered to have been denied the free choice to admit, deny, or refuse to answer is what the Supreme Court refers to as a "penalty situation." *Murphy*, 465 U.S. at 435. *Murphy* specified that in the probationary context, this rule means the state may require the probationer "'to appear and discuss matters affecting his probationary status,'" but that "the probationer may not be required under the threat of revocation of his probation to respond to 'questions put to him, however relevant to his probationary status, that call for answers that would incriminate him in a later criminal proceeding.'" *Saechao*, 418 F.3d at 1077 (quoting *Murphy*, 465 U.S. at 435).

Norwick generally asserts that since Norwick's conditions of supervision require him to be truthful and cooperative, any statement he made in response to questions by the officers must be suppressed as involuntarily compelled. (Doc. 26 at 18). Under these conditions, Norwick could not ignore any questions or communications from officers during any interaction without risking having his supervision revoked. (*Id.* at 11–13). Norwick does not discuss why the fourth statement specifically was involuntarily compelled.

The Government responded that Norwick "was not compelled to provide the fourth statement" because it was "not responsive to any question posed to him by any officer, expressly or by implication," and "was a statement of clarification" by him as to the types of firearms found. (Doc. 33 at 14). The Government contends

the conditions do not "state he must offer statements to probation that are not in response to any question he was posed," nor did he make the fourth statement under the threat of revocation. (*Id.*). Rather, "he simply chose to make" it. (*Id.*).

Norwick's statement was not involuntarily compelled by the conditions of his probation. As the Government explains, Norwick's conditions require him to be cooperative and truthful. His conditions do not require him to volunteer statements when nothing is being asked of him. *Cf. Saechao*, 418 F.3d at 1078 (holding that a probationer is compelled to provide incriminating answers when his conditions of supervision required him *to answer all inquiries* made by a probationer officer); *United States v. Watson*, No. 22-cr-00149, 2023 WL 6794074, at *5–*6 (D. Idaho Oct. 13, 2023) (holding that a condition requiring a probationer to cooperate with the probation office "'threatens by implication' that *the failure to answer questions or comply with requests* will result in revocation of parole.") (emphasis added).

Additionally, Norwick did not make the fourth statement in response to a question or statement directed at him. Ahern was talking on the phone to her supervisor on the other side of the garage from where Norwick stood. Ahern agreed with the Government's characterization of Norwick as "eavesdropping" on Ahern's phone call with Stichman, then deciding to chime in to clarify the types of guns found. Ahern made no attempt to elicit the statement, so Norwick's statement was voluntary.

Accordingly, Norwick's fourth statement was not involuntarily compelled. Suppression is not warranted on this ground.

B.   *Suppression of the Statement as in Violation of* Miranda

Norwick next argues suppression is necessary because his *Miranda* rights were violated. "In *Miranda v. Arizona*, the Supreme Court adopted prophylactic procedural measures to guarantee that a suspect is advised of his Fifth Amendment rights before custodial interrogations." *United States v. Craighead*, 539 F.3d 1073, 1082 (9th Cir. 2008) (citing *Miranda v. Arizona*, 384 U.S. 436, 444–45 (1966)). These measures, known as *Miranda* rights, are constitutional in nature. *See Dickerson v. United States*, 530 U.S. 428, 435 (2000).   Failure to advise a suspect of their *Miranda* rights before a custodial interrogation violates the Fifth Amendment and justifies suppression of any statements a defendant made during the interrogation. *Id.*

Whether law enforcement needs to advise a suspect of their *Miranda* rights depends on two questions: Was the defendant (1) in custody, and (2) subject to an interrogation? *Miranda*, 384 U.S. at 444.

The Government does not dispute that Norwick was in custody.  The Court agrees, since Norwick was in handcuffs, his movements were controlled by the probation officers as they searched his house, and he had been confronted with his guilt pertaining to the violations of his conditions of supervision. *See United States*

*v. Barnes*, 713 F.3d 1200, 1204 (9th Cir. 2013) (outlining the factors relevant to whether a person was in custody). Thus, the Court will only look at whether Norwick was subject to an interrogation when he made the fourth statement.

"The test to determine whether questioning is interrogation within the meaning of *Miranda* is whether under all of the circumstances involved in a given case, the questions are reasonably likely to elicit an incriminating response from the suspect." *United States v. Salgado*, 292 F.3d 1169, 1172 (9th Cir. 2002) (internal citations and quotation marks omitted). *Miranda* is not limited to "express questioning" or to statements "punctuated with a question mark." *Rhode Island v. Innis*, 446 U.S. 291, 301 & n.6 (1980). Rather "'the *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent.'" *Martinez v. Cate*, 903 F.3d 982, 993 (9th Cir. 2018) (quoting *Innis*, 446 U.S. at 300–01).

"The functional equivalent of interrogation is defined as 'any words or actions on the part of the police ... that the police should know are reasonably likely to elicit an incriminating response from the suspect.'" *Id.* (quoting *Innis*, 446 U.S. at 301). This definition "focuses primarily upon the perceptions of the suspect, rather than the intent of the police[.]" *Innis*, 446 U.S. at 301. However, it also is an objective standard, such that the police "cannot be held accountable for the unforeseeable results of their words or actions[.]" *Id.* at 302.

Volunteered statements are not covered by *Miranda*.  *Miranda*, 384 U.S. at 479.  Responses to law enforcement's statements that are "not the type of comments that would encourage [an individual] to make some spontaneous incriminating remark" are not subject to suppression.  *Shedelbower v. Estelle*, 885 F.2d 570, 573 (9th Cir. 1989).

Norwick generally argues that any assertion that the statement was "spontaneous or volunteered ... should be foreclosed by the continued questioning of [Norwick] that occurred in two different locations." (Doc. 26 at 26).  He also asserts that the conditions of his release "magnified the coercive nature of the encounter under the *Miranda* analysis." (*Id.*).

The Government maintains that Norwick did not make the fourth statement in the context of an interrogation because it was "not made in response to any question posed by Officer Ahern or any other officer." (Doc. 33 at 11).  The Government notes that Ahern was not talking to Norwick, was on the other side of the garage, and simply stated that there were three shotguns when "Norwick blurted out his correction." (*Id.*).

Norwick was not subject to an interrogation because he did not make his statement in response to any question or statement directed at him expressly or implicitly.  Again, Ahern was talking on the phone to her supervisor on the other side of the garage from where Norwick stood.  Norwick volunteered the information

about the guns from across the room. Ahern could not have reasonably foreseen that her statement about the guns to another person not even in the room while she was standing relatively far away from Norwick would elicit an incriminating, let alone any, response from Norwick. Rather, his statement was voluntary.

Even if Ahern was next to Norwick when she said they found three shotguns, it was not reasonably foreseeable to expect the content of her statement to elicit Norwick's response. She did not ask anyone what kind of guns they were or even state she was unsure what kinds they were. In fact, she testified that for probation, the type of gun is irrelevant, since probationers are not allowed to have any kind.

Accordingly, Norwick was not subject to an interrogation when he made the fourth statement. Officers did not violate Norwick's rights under *Miranda*, and so suppression is not warranted.

## III.   Conclusion

IT IS SO ORDERED that Defendant Douglas Eugene Norwick, Jr.'s Motion to Suppress (Doc. 25) is DENIED.

DATED this 29th day of April, 2024.

SUSAN P. WATTERS
United States District Judge